IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ELIJAH STANLEY                                                                                    PLAINTIFF

vs.                                       CIVIL NO. 05-1030

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                                DEFENDANT

## MEMORANDUM OPINION

Elijah Stanley (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his application for supplemental security income benefits ("SSI"), under Title XVI of the Act.

## Background:

The application for SSI now before this court was filed on April 23, 2002, alleging an onset date of April 1, 2002, due to a weak heart, back trouble, swelling and soreness of the legs and feet, and high blood pressure. (Tr. 42-45, 70). An administrative hearing was held on February 18, 2004. (Tr. 402-439). Plaintiff was present and represented by counsel.

At the time of the administrative hearing on February 18, 2004, plaintiff was thirty-nine years old and possessed a seventh grade education. (Tr. 409). The record reveals that he had past relevant work ("PRW"), as a road worker, mill worker, fish farm laborer, and recycling plant worker. (Tr. 71, 435-436).

On November 15, 2004, the Administrative Law Judge ("ALJ"), found that, although plaintiff's cardiomyopathy and hypertension were severe impairments, those impairments did not

AO72A
(Rev. 8/82)

meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 16). After discrediting plaintiff's subjective allegations, the ALJ concluded that he maintained the residual functional capacity ("RFC"), to perform sedentary work. (Tr. 16). Although he determined that plaintiff could not return to his PRW, based on the Medical-Vocational Guidelines (the "Grids"), he found that plaintiff was not disabled.

On March 21, 2005, the Appeals Council declined to review this decision. (Tr. 4-6). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 8).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and

one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevent him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

3

**Discussion:**

Of particular concern to the undersigned is the ALJ's failure to factor plaintiff's chest pain into his RFC assessment. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has made the following ruling concerning pain:

> Pain may be a nonexertional factor to be considered in combination with exertional limitations as well as a separate and independent ground for disability. . . . Where pain is considered in combination with exertional limitations, however, it need only be found significant enough to prevent the claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies.

*McCoy v. Schweiker*, 683 F.2d 1138, 1148 (8th Cir. 1982) (en banc) (reversed on other grounds).

In the present case, records indicate that plaintiff had a history of persistent hypertension and arteriosclerotic cardiovascular disease. (Tr. 113). On April 9, 2002, plaintiff was treated for substernal discomfort, as well as left chest and left shoulder pain. (Tr. 91, 191). An electrocardiogram ("EKG"), was essentially normal, showing only some increased voltage. However, plaintiff was referred to the emergency room ("ER"), for further evaluation. Records indicated that plaintiff had been non-compliant with his blood pressure medication. He was started on a Nitroglycerine drip for his chest pain, and kept in the cardiac unit overnight. (Tr. 194). The following morning, plaintiff was free of chest pain. Because his blood pressure was still somewhat elevated, Dr. Aldo Fonticiella, a cardiologist, was consulted. He advised the ER staff to wean

plaintiff off of the Nitroglycerine and, if possible, arrange for a stress test the following day. If they were not able to wean plaintiff off of the medication without the recurrence of chest pain, then the ER was to call Dr. Fonticiella back and schedule a cardiac catheterization. (Tr. 195).

On April 11, 2002, Dr. Forticiella reported that a myocardial infarction had been ruled out, and that plaintiff was presently pain-free without the assistance of nitrates. (Tr. 197). Accordingly, plaintiff was scheduled for a heart catheterization the following morning. It revealed severe cardiomyopathy with an ejection fraction rate of fifteen to twenty percent.[1] (Tr. 258).

On April 25, 2002, progress notes from Dr. Fonticiella indicated that plaintiff's recent catheterization had shown no evidence of coronary artery disease, but did reveal severely reduced left ventricular systolic function. (Tr. 287). Plaintiff continued to report feeling weak and short of breath. Although a physical exam was normal, an EKG revealed left ventricular hypertrophy. (Tr. 187, 287). Therefore, Dr. Fonticiella increased plaintiff's dosage of Coreg. (Tr. 287).

On May 9, 2002, plaintiff indicated that he had experienced no side effects from the recent increase in his Coreg dosage. (Tr. 284). However, he stated that he did not feel that his condition had improved. Following an unremarkable physical examination, Dr. Fonticiella again increased plaintiff's dosage of Coreg. (Tr. 285).

This same date, an echocardiogram revealed moderately reduced left ventricular systolic function, mild tricuspid regurgitation, and an ejection fraction rate of forty-five percent. (Tr. 286).

On May 28, 2002, progress notes indicated that plaintiff had tolerated the increased dosage of Coreg without difficulty. (Tr. 282). However, he complained of continued shortness of breath

---

[1]To meet the listings, a person must have a left ventricular ejection fraction rate of thirty percent or less and a cardiologist's conclusion that the performance of an exercise test would present a significant risk to the individual. 20 C.F.R. Pt. 404, subpart. P, App. 1, § 4.04.

and weakness. (Tr. 282). Further, his EKG was abnormal, revealing left ventricular hypertrophy with nonspecific ST junctional depression. (Tr. 184). As such, Dr. Fonticiella increased his dosage of Accupril. (Tr. 283).

On May 30, 2002, plaintiff again sought emergency treatment for chest pain. (Tr. 166). He described the pain as a dull and crushing substernal pain that radiated into his left arm. (Tr. 169). The pain also caused him to be short of breath and diaphoretic. (Tr. 166, 169). An EKG revealed left ventricular hypertrophy, while a chest x-ray was unremarkable. (Tr. 169). After treatment via Nitroglycerine tablets, plaintiff was released home in satisfactory condition. He was directed to follow-up with Dr. Fonticiella the following day. (Tr. 166).

On June 4, 2002, plaintiff reported that he had tolerated his recent increase in Accupril well. (Tr. 280). He stated that he was feeling better, and denied having any chest pain. A physical examination was unremarkable, but plaintiff's EKG continued to show left ventricular hypertrophy with repolorization abnormality. (Tr. 164, 281). As such, Dr. Fonticiella increased plaintiff's dosage of Coreg. (Tr. 281).

An EKG dated August 20, 2002, was abnormal. (Tr. 162). It revealed left ventricular hypertrophy with inferior ST-T changes. (Tr. 162).

On September 3, 2002, plaintiff denied any chest pain or shortness of breath. (Tr. 277). He stated that he had refilled his medications, as directed, following his last visit. However, plaintiff's blood pressure was noted to be high. (Tr. 278). After being diagnosed with cardiomyopathy, hypertension, mitral valve prolapse, and tricuspid regurgitation, Dr. Fonticiella increased plaintiff's dosage of Norvasc. (Tr. 278).

On September 9, 2002, an echocardiogram revealed moderately reduced left ventricular

6

function, trace mitrovalve regurgitation, mild tricuspid regurgitation, and an ejection fraction rate of forty-five percent. (Tr. 279).

On September 12, 2002, progress notes indicated that plaintiff had tolerated the increase in Norvasc well. (Tr. 275). Although plaintiff denied any chest pain or shortness of breath, his blood pressure continued to be elevated, and his EKG was borderline. (Tr. 159, 276). Accordingly, Dr. Fonticiella discontinued the Accupril, and prescribed Hyzaar. (Tr. 276).

On September 26, 2002, plaintiff was noted to be tolerating the Hyzaar well, and reported feeling "okay." (Tr. 273). No cardiovascular complaints were recorded, and his EKG showed no changes since his last examination. Dr. Fonticiella increased plaintiff's Norvasc dosage to twice daily, and scheduled him for a follow-up cardiac evaluation in one month. (Tr. 274).

On November 2, 2002, plaintiff presented at the ER with a mildly abnormal EKG, revealing left ventricular hypertrophy. (Tr. 113). Plaintiff reported chest pain that had begun when he bent over to put on his shoes. (Tr. 113, 119). Upon presentation at the ER, he was given Nitroglycerine, and his blood pressure dropped precipitously. Plaintiff was also given Morphine for the pain. He was admitted for an overnight stay in the Coronary Care Unit, where he was noted to have an elevated CPK level. Plaintiff's chest pain persisted, and a Heparin drip was begun at the direction of a cardiologist at the Heart Hospital in Little Rock, Arkansas. On November 3, 2002, plaintiff was transferred to Little Rock for further evaluation and treatment. His diagnoses were angina pectoris and arteriosclerotic cardiovascular disease with left ventricular hypertrophy. (Tr. 113).

On November 4, 2002, in Little Rock, plaintiff underwent a nuclear treadmill test. (Tr. 354-355). The results were negative for provocation of angina, but revealed left ventricular hypertrophy, mild nonspecific ECG changes, mild soft tissue attenuation, and normal left ventricular volumes and

AO72A
(Rev. 8/82)

regional wall motion with an overall ejection fraction being within the lower limits of normal. (Tr. 355). Plaintiff was released home from the heart hospital on November 5, 2002, after an echocardiogram revealed normal left ventricular size with preserved left ventricular systolic function and an ejection fraction rate of sixty percent. (Tr. 353).

On December 3, 2002, plaintiff reported continued occasional episodes of fatigue and shortness of breath, but denied any associated chest pain. (Tr. 271). An EKG revealed left ventricular hypertrophy with a repolarization abnormality. (Tr. 110). After being diagnosed with an abnormal EKG, cardiomyopathy, hypertension, fatigue, and shortness of breath, plaintiff was directed to continue with his present medication. (Tr. 272). Because his blood pressure was elevated, and plaintiff had not been taking his medications as prescribed, he was referred to the Interfaith Clinic for possible help obtaining his medication. (Tr. 272).

On February 18, 2003, plaintiff stated that he had experienced pain in both arms and heart palpitations the previous night. (Tr. 269). He indicated that the last episode had lasted approximately twenty minutes, and went away on its own. Plaintiff also reported that he was out of medication. An EKG was abnormal, showing sinus tachycardia, possible left atrial enlargement, and left ventricular hypertrophy with repolarization abnormality. (Tr. 106-107). Plaintiff was directed to continue with his present medication, and to return for a follow-up in three months. (Tr. 270).

On May 20, 2003, plaintiff presented for his three month cardiac evaluation with Dr. Fonticiella. (Tr. 267). Dr. Fonticiella diagnosed him with an abnormal EKG, cardiomyopathy, chest pain, and hypertension. (Tr. 268). He then continued plaintiff on his present medications, and scheduled plaintiff for a persantine cardiolyte stress test. (Tr. 268).

On May 22, 2003, plaintiff underwent a nuclear stress test. (Tr. 265). It revealed reversible

ischemic changes, a fixed inferior defect, and markedly reduced left ventricular systolic function. (Tr. 265).

On May 29, 2003, plaintiff complained of continued chest pain. (Tr. 263). As such, Dr. Fonticiella ordered a diagnostic cardiac catheterization. (Tr. 264). The catheterization revealed no evidence of angiographic disease. (Tr. 249-250). However, plaintiff's ejection fraction rate was thirty-five percent. (Tr. 250).

On April 11, 2003, plaintiff complained of a headache and elevated blood pressure. (Tr. 394). He stated that he had been taking his blood pressure medication. Accordingly, he was prescribed Norvasc. (Tr. 394).

On June 5, 2003, plaintiff presented for a post diagnostic cardiac catheterization follow-up. (Tr. 261). Plaintiff stated that he was doing well, and continued to tolerate his medications. He denied chest pain, or shortness of breath. However, plaintiff's blood pressure remained elevated. (Tr. 262). After diagnosing plaintiff with an abnormal EKG, cardiomyopathy, and hypertension, Dr. Fonticiella directed him to continue his present medications. (Tr. 262).

On July 1, 2003, plaintiff presented at Dr. Fonticiella's office for a cardiac evaluation. (Tr. 259). Plaintiff reported experiencing chest pain, but denied any associated shortness of breath at the present time. He also indicated that he was presently out of Hyzaar, but that he was tolerating his medications well. Plaintiff was noted to be in no acute distress, and was pleasant and cooperative. (Tr. 260). His blood pressure was elevated, but no other abnormalities were noted. A such, Dr. Fonticiella diagnosed him with an abnormal EKG, chest pain, and hypertension. He then refilled plaintiff's Hyzaar prescription, and directed him to take his medication as prescribed. (Tr. 260).

On October 14, 2003, plaintiff presented with complaints of sharp chest pain on his left side

9

that radiated into his left arm. (Tr. 301). He also stated that he had been short of breath, fatigued, and had experienced elevated blood pressure readings. However, plaintiff admitted that he had run out of his blood pressure medication, and had not been taking it as prescribed. Dr. Fonticiella noted that plaintiff's blood pressure remained high, and instructed him to continue with his present medication. (Tr. 302). He also stressed with plaintiff the importance of taking his medication as prescribed, and agreed to mail plaintiff's samples of his medication, and to try and find an assistance program through which plaintiff could obtain his medications. (Tr. 302).

On December 30, 2003, plaintiff stated that, over the past week, he had been experiencing chest pain on his left side that radiated into his left arm and the tips of his fingers. (Tr. 299). He also indicated that he had been experiencing shortness of breath associated with lightheadedness, dizziness, diaphoresis, and some edema. In response to these symptoms, Dr. Fonticiella prescribed Lasix and potassium chloride. (Tr. 300).

On January 5, 2004, plaintiff presented with complaints of continued high blood pressure. (Tr. 395). He denied chest pain, but did report occasional episodes of chest tightness. Plaintiff was directed to continue his present medications, prescribed Keflex, and ordered to undergo further laboratory tests. (Tr. 395).

On January 8, 2004, plaintiff continued to experience chest pain on the left side that radiated into his left arm. (Tr. 390). However, he reported that the pain could be relieved by taking Nitroglycerine. Plaintiff also complained of shortness of breath associated with diaphoresis. For this, Dr. Fonticiella prescribed Imdur. (Tr. 391).

On February 3, 2004, plaintiff complained of left knee pain. (Tr. 396). He reported an old knee injury. The doctor prescribed Motrin and Keflex. (Tr. 396).

10

In April 2004, Dr. Fonticiella wrote a letter indicating that plaintiff's cardiac functional capacity classification was a Class III, according to the American Heart Association's functional capacity guidelines. (Tr. 399, 401). A Class III functional capacity results in marked limitation of physical activity. *See* American Heart Association, 1994 REVISIONS TO CLASSIFICATION OF FUNCTIONAL CAPACITY AND OBJECTIVE ASSESSMENT OF PATIENTS WITH DISEASES OF THE HEART (1994), *at* www.americanheart.org. At this level of functioning, the patients are comfortable at rest, but less than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain. *Id*.

Given the medical evidence of record, we do not find substantial evidence to support the ALJ's conclusion that plaintiff could perform a full range of sedentary work, with no exertional limitations. As stated above, plaintiff's treating physician rated his functional capacity at a Class III, which indicates that plaintiff could do sedentary work, but less than ordinary activity while sitting would cause fatigue, palpitation, dyspnea, or anginal pain. *Id*. As this was neither considered nor discussed by the ALJ, on remand, he is directed to reconsider plaintiff's RFC assessment, paying careful attention to his reports of chest pain and the objective tests supporting those reports.

It is also significant to note that the only RFC assessment contained in the record was completed by a non-examining, consultative physician. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once, or not at all, does not generally constitute substantial evidence). Further, this RFC assessment was completed in September 2002, despite the fact that the majority of plaintiff's medical records are dated after this date. (Tr. 95-104). Thus, given the nature of plaintiff's impairment and the medical evidence before this court, we believe that an up-to-date RFC assessment from a treating physician is necessary for a fair and accurate resolution of this matter. *See Vaughn v. Heckler*, 741 F.2d 177, 179

11

(8th Cir. 1984) (If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record).

Accordingly, on remand, the ALJ is directed to address interrogatories to the physicians who have evaluated and/or treated plaintiff, asking them to review plaintiff's medical records; complete a physical RFC assessment regarding plaintiff's capabilities during the time period in question; and, provide the objective basis for their opinions, so that an informed decision can be made regarding plaintiff's ability to perform basic work activities on a sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

The undersigned is well aware of the evidence indicating that plaintiff was non-compliant with his hypertension medication. (Tr. 91, 191, 259, 269, 272, 301, 302). However, we also note that the medical records reveal that plaintiff's non-compliance may have been due to an inability to pay for his medications. (Tr. 272, 302). Because economic justifications for lack of treatment can be relevant to a disability determination, on remand, the ALJ is directed to consider plaintiff's financial condition before dismissing his subjective complaints on the basis of non-compliance. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992).

## **Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence, and therefore, the denial of benefits to the plaintiff, should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

AO72A
(Rev. 8/82)

DATED this 10th day of May 2006.

                                         /s/ Bobby E. Shepherd
                                         HONORABLE BOBBY E. SHEPHERD
                                         UNITED STATES MAGISTRATE JUDGE

**AO72A**
**(Rev. 8/82)**